**William C. HOUCHIN, Jr., Petitioner,**

v.

**Aristedes W. ZAVARAS, Director, Colorado Department of Corrections, Respondent.**

Civil A. No. 93–K–2651.

United States District Court, D. Colorado.

March 28, 1996.

Jean E. Dubofsky, Boulder, CO, for petitioner.

Wendy J. Ritz, Assistant Attorney General, Denver, CO, for respondent.

## MEMORANDUM DECISION AND ORDER

KANE, Senior District Judge.

Before me is William C. Houchin Jr.'s Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. On January 24, 1986, Houchin was convicted of two counts of first degree murder after deliberation under Colo. Rev.Stat. § 18–3–102(1)(a) (1986) in the District Court, Pueblo County, Colorado and sentenced to two consecutive life terms of imprisonment.

Houchin seeks relief on the grounds that he was denied effective assistance of counsel at his trial in violation of the due process clause of the Fourteenth Amendment to the United States Constitution. He asks that his convictions be vacated and the matter returned to the state district court for further proceedings on the original charges.

I deny the petition.

### I. *Procedural Background.*

On March 29, 1984, an information was filed in Pueblo, Colorado, charging Houchin with two counts of murder in the first degree of his father-in-law, Louis D. Naureth, and his mother-in-law, Mary Lou Naureth.

Houchin was initially represented by members of the Colorado State Public Defender's Office located in Pueblo. The public defenders filed numerous pretrial motions, many relating to the death penalty issue. The prosecution advised the court on July 14, 1984 that it would not seek the death penalty.

Late in 1984, Houchin's father, in the course of a real estate matter, met Thomas H. Heaton, a lawyer licensed to practice in Massachusetts and other jurisdictions, but not in Colorado. Houchin's father discussed the case with Heaton and, based on Heaton's representations as to his experience, asked him to represent Houchin. In January 1985, Heaton contacted the Pueblo public defender's office and reviewed the public defender's file. He discussed the case and all proposed defenses extensively with the deputy state public defender Steve Alcala assigned to the case. Heaton accepted the case and was retained by Houchin's father.

Heaton hired co-counsel, Terry Perlet, an attorney from Colorado Springs, Colorado, whose experience with criminal cases began in 1970. He had been a deputy district attorney for four years, became chief trial deputy with the El Paso County District Attorney's Office, and, from 1980 engaged almost exclusively in representing clients in criminal cases. He had tried nearly one hundred felony cases, including approximately ten murder trials, had a particular interest in forensic evidence and had tried a case with issues similar to those presented in Houchin's. Houchin's father agreed to pay Heaton and Perlet $50,000 to represent his son. A private investigator, Robert Brown was hired for the defense. The public defender withdrew and handed over his entire case file to Heaton and Perlet who entered their appearances for Houchin on February 11, 1985.

Heaton and Perlet filed and argued additional pretrial motions on which the court ruled. The jury trial commenced on January 14, 1986. On the eighth day, the jury returned verdicts of guilty on both counts of first degree murder. Houchin was sentenced to two consecutive terms of life imprisonment.

After Houchin filed a pro se appeal, the state court of appeals granted his motion for a limited remand for a hearing in the state district court of his motion for post-conviction relief under Colorado Rule of Criminal Procedure 35(c) based on his claim that he had received ineffective assistance of counsel in violation of the United States and Colorado constitutions.[1]

Thereafter, the trial court found Houchin indigent and appointed a public defender to represent him on appeal. Subsequently, Houchin's family retained the law firm of Tegtmeier & Sears, P.C. to represent him in his appeal and to investigate his claim of ineffective assistance of counsel.

The Rule 35 proceeding lasted seven days. The state trial court judge, the Honorable Jack F. Seavy, heard the first five days of testimony. On June 1, 1989, the Honorable Richard D. Robb advised the parties that Judge Seavy had died on the previous day.

Judge Robb informed Houchin of his right to have the same judge hear the entire matter and to start anew with the Rule 35 hearing. Alternatively, Judge Robb stated, Houchin could waive that right and allow him to review and consider the transcripts of the hearings to that date, determining the witnesses' credibility from the transcripts, and to go forward with the remainder of the hearing and make the ruling on the Rule 35(c) motion. Houchin expressly elected to go forward with the hearing before Judge Robb and allow him to rule on the motion.

On November 28, 1990, Judge Robb denied Houchin's motion for Rule 35 relief. He

---

1. Rule 35(c)(2) of the Colorado Rules of Criminal Procedure provides in pertinent part:

[E]very person convicted of a crime is entitled as a matter of right to make application for postconviction review upon the grounds hereinafter set forth. Such an application for postconviction review must, in good faith, allege one or more of the following grounds to justify a hearing thereon:

. . . .

(I) That the conviction was obtained or sentence imposed in violation of the Constitution or laws of the United States or the constitution or laws of this state

. . . .

determined most of the actions of counsel which Houchin challenged were not outside the range of reasonably competent assistance of counsel but that the following actions were: Perlet's failure to clearly articulate any defenses in his opening statement to the jury or to provide defense theory instructions to the trial court for submission to the jury and failure to spend more time with Houchin preparing him to testify, Heaton's conduct in the courtroom, possibly under the influence of alcohol, and his cross-examination of prosecution witness Ron Miller at trial.

The state district court, nevertheless, found the overall performance of Houchin's counsel was not below the level of reasonably competent assistance to which an accused is constitutionally entitled and that there was no reasonable probability that, but for the deficiencies found by the court, the result would have been different. *See Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Accordingly, the state district court denied Houchin's Rule 35(c) motion. *People v. Houchin,* No. 84 CR 79 (Dist.Ct.Co. Pueblo Nov. 28 1990) (*"Houchin I"*).

Houchin appealed the denial to the Colorado Court of Appeals. The appeals court agreed with the trial court that a number of the errors alleged were not outside the range of reasonably competent performance. However, it agreed that defense counsel's failure to articulate any theory in his opening statement, failure to tender to the trial court for presentation to the jury any instruction on a defense theory, and failure to spend more time with Houchin in preparation of trial testimony were below the range of minimal competence. The appeals court also concluded the outcome of the proceeding would not have been different even with competent performance by counsel.

Contrary to the district court's finding, the state court of appeals found counsel's overall performance was below the level of reasonably competent assistance to which an accused is constitutionally entitled. Even accepting the alleged deficiencies, however, the court found the record failed to establish that, but for such deficiencies, the result of the trial would have been different. *See*

*Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. *People v. Houchin,* No. 86CA0683 (Colo.App. Aug. 20, 1992), (*"Houchin II"*). Accordingly, the appeals court affirmed the judgment of the state district court.

Houchin filed a petition for writ of certiorari in the Colorado Supreme Court which was denied on May 24, 1993.

On December 16, 1993, having exhausted the available state court remedies as required under 28 U.S.C. § 2254(b), Houchin filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254(a) in this court on the ground that he is in custody in violation of his rights under the United States Constitution because he was denied effective assistance of counsel at trial.

The case was originally assigned to then Chief Judge Finesilver who issued an order to show cause why the petition should not be granted. Respondent filed an answer to show cause and Houchin replied. The action was reassigned to me on February 17, 1995. Oral argument on the petition was heard on May 31, 1995. This opinion follows.

## II. *Factual Background.*

The following are the facts essentially admitted by both parties. Houchin was married to the Naureths' daughter Linda and living in a basement apartment of the Naureths' home at the time of the murders. On March 17, 1984 Linda told Houchin she wanted a divorce. He then left the Naureth home. Houchin returned the next day when Linda and her mother, Mary Lou ("Mrs. Naureth"), were out and her father, Louis ("Mr. Naureth"), was working on his truck in the garage. At some point, Houchin went to the garage and there was a struggle between him and Mr. Naureth.

Houchin shot Mr. Naureth twice and Houchin was shot once in the arm. Houchin then went to the basement apartment, changed his shirt, picked up a rifle, returned to the garage and again shot Mr. Naureth, who may have already been dead, in the head. Houchin then destroyed furnishings in the house and killed one of the dogs.

When Linda and Mrs. Naureth returned home, Houchin was in the house with a re-

volver and a rifle. Mrs. Naureth headed for the garage. Linda attempted to restrain Houchin, they struggled for the revolver, Houchin shoved Linda against the wall and she ran across the street for help.

Houchin came through the door from the house into the garage and fired two shots from his revolver. He then left.

Police were called by a neighbor and arrived a short time later. They found Mary Lou had been shot and was on the ground across the street from her home. She died of a single gunshot wound while being treated at the hospital. Mr. Naureth was found dead on the floor of the garage.

Houchin was found asleep on the seat of his pickup truck in LaVeta, Colorado, near his parents' home. He was bleeding from a gunshot wound to his left arm and one of the arresting officers noticed an alcohol odor on his breath. He appeared unconscious while being transported to the hospital and during the first hour and fifteen minutes of emergency room treatment. Tests showed that at 7 a.m. Houchin had a blood alcohol level of .232 and a urine alcohol level of .359.

At the time of his arrest, Houchin had a powder burn on his right palm and his shirt had dust or debris on it and a bullet hole in the left sleeve.

### III. Effective Assistance of Counsel.

The Sixth Amendment pertinently provides: "In all criminal prosecutions, the accused shall enjoy the right to ... have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The right to assistance of counsel has long been recognized as the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. at 686, 104 S.Ct. at 2063–64; *United States v. Cronic*, 466 U.S. 648, 654, 104 S.Ct. 2039, 2043–44, 80 L.Ed.2d 657 (1984)

A defendant must ordinarily prove deficient performance of counsel coupled with a showing of prejudice in order to prevail on an ineffective assistance of counsel claim. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. However, courts have recognized a narrow class of circumstances, where the particular circumstances "are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Cronic*, 466 U.S. at 658, 104 S.Ct. at 2046. If a defendant can prove such circumstances existed, prejudice will be presumed. *Id.* at 659–62, 104 S.Ct. at 2047–49. *See United States v. Williamson*, 53 F.3d 1500, 1510–11 (10th Cir.), *cert. denied, Dryden v. U.S.,* —— U.S. ——, 116 S.Ct. 218, 133 L.Ed.2d 149 (1995).

Houchin challenges his conviction on the grounds outlined in both *Cronic* and *Strickland*. Proper functioning of the adversarial process is the focus of both lines of inquiry. *See Strickland*, 466 U.S. at 686, 104 S.Ct. at 2063–64; *Cronic*, 466 U.S. at 656–57, 104 S.Ct. at 2045–46.

### IV. Standard of Review.

"To establish a claim for ineffective assistance of counsel, a defendant must show that (1) his counsel's performance was constitutionally deficient, and (2) counsel's deficient performance was prejudicial. The performance and prejudice components of the *Strickland [v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984) ] analysis present mixed questions of law and fact which we review de novo."

*Jones v. Stotts*, 59 F.3d 143, 145 (10th Cir. 1995) (quoting *Banks v. Reynolds*, 54 F.3d 1508, 1515 (10th Cir.1995)) (further quotations and citations omitted).

The Supreme Court implicitly questioned the de novo standard of review in *Wright v. West*, 505 U.S. 277, 289–90, 112 S.Ct. 2482, 2488–89, 120 L.Ed.2d 225 (1992). However, in *Ballinger v. Kerby*, 3 F.3d 1371, 1376 n. 3 (10th Cir.1993), the Tenth Circuit adhered to its earlier rulings on standard of review, noting *Wright* had declined to decide the appropriate level of deference.

The state court's factual findings made in the course of deciding an ineffectiveness claim are subject to the deference requirement of 28 U.S.C § 2254(d). *Strickland*, 466 U.S. at 698, 104 S.Ct. at 2070; *Manlove v. Tansy*, 981 F.2d 473, 476 (10th Cir.1992); *United States v. Owens*, 882 F.2d 1493, 1501 n. 16 (10th Cir.1989).

### V. Request for Evidentiary Hearing.

In Houchin's reply to the response to the order to show cause, he requested me to grant an evidentiary hearing pursuant to Rule 8 of the rules governing § 2254 cases and District Court of Colorado Local Rule 72.4[F]. He asserted such hearing should allow him to show counsel's numerous omissions prejudicially prevented him from establishing a defense of intoxication or lack of deliberation. He also requested me to order the complete transcripts of the trial and Rule 35(c) hearing.

■ The requirement of holding an evidentiary hearing in a habeas corpus proceeding was addressed in *Townsend v. Sain*, 372 U.S. 293, 313, 83 S.Ct. 745, 757, 9 L.Ed.2d 770 (1963), *overruled on other grounds by Keeney v. Tamayo Reyes*, 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992). The Court stated, "where the facts are in dispute, the Federal Court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding." *Townsend, Id.* at 312, 83 S.Ct. at 757. *See also Medina v. Barnes*, 71 F.3d 363, 369 (10th Cir.1995).

An evidentiary hearing is mandatory in six situations:

> If (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full-and-fair hearing; (4) there is substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

*Townsend*, 372 U.S. at 312–13, 83 S.Ct. at 757.

Here, there is no allegation, nor would there be a basis therefor, that any of the situations outlined in *Townsend* applies. From my review of the record, I conclude Houchin received a full and fair evidentiary hearing on the issue of the alleged ineffective assistance of counsel at the Rule 35(c) hearing in the state district court.

Assisted by counsel, and after careful explanation of his rights by Judge Robb, Houchin expressly waived the opportunity to recommence the Rule 35(c) hearing following the death of Judge Seavy. Despite this waiver, however, during oral argument on this habeas petition, Houchin's counsel requested that because the findings of fact upon the Rule 35(c) motion were made by Judge Robb, without having observed the demeanor of some of the witnesses, I should give less deference to the trial court's findings of fact than that customarily afforded in habeas proceedings.

Following my review of the record, and considering Houchin's earlier waiver, however, I see no reason to depart from the deference requirement of 28 U.S.C § 2254(d) insofar as the state court's factual determinations are concerned.

### VI. Analysis.

#### A. Cronic Analysis.

To satisfy the *Cronic* standard, Houchin must establish the surrounding circumstances made it unlikely that he could have received the effective assistance of counsel at his trial, i.e. that his attorneys' situation was equivalent to a constitutional violation where prejudice is presumed. *Cronic*, 466 U.S. at 658–62, 104 S.Ct. at 2046–49.

■ In his petition, Houchin argues prejudice is presumed in this case under *Cronic* based on the following. He notes the state district court concluded counsel Perlet's failure to articulate clearly Houchin's defenses in his opening statement, to provide defense theory instructions, to have spent more time with Houchin preparing him for trial, in particular to give testimony during trial, and counsel Heaton's apparent intoxication and improper conduct at trial when he cross-examined a witness, were "outside the range of reasonably competent assistance demanded of attorneys practicing criminal law." *Houchin I* at 25.

The state district court nevertheless found, based on all of the evidence presented at the Rule 35(c) hearing, the entire record and all relevant circumstances surrounding the proceedings, "the defense attorneys' overall performance was not below the level of reasonably competent assistance to which an accused is constitutionally entitled." *Id.* at 30.

Applying the two-prong test of *Strickland,* the court determined there was no reasonable probability that, but for the deficiencies found by the court, the result of the trial would have been different. *Id.* It found the errors allegedly committed by trial counsel, may, at best, have provided additional evidence of struggle and/or self-defense and/or accident." *Id.* Such evidence, the court determined "would have been merely cumulative." *Id.*

The district court noted nothing was presented at the Rule 35(c) hearing which would account for the wound to the head of Mr. Naureth, which caused his death or why Houchin fired two shots at the fleeing Mrs. Naureth. Accordingly, the court concluded evidence of Houchin's guilt was "overwhelming." *Id.* at 31. Citing *Cronic,* the court found, despite the errors of counsel, the adversarial testing envisaged by the Sixth Amendment had occurred. *Id.*

Houchin further notes the state court of appeals agreed with the district court's conclusions that Perlet's failure to articulate a theory of defense in his opening statement, failure to tender an instruction on a theory of defense, and failure to spend more time with Houchin in preparation of his testimony, were outside the range of reasonably competent assistance. *Houchin II* at 14, 16.[2]

The appeals court concluded:

We disagree with the trial court's final conclusion that defense counsel's overall performance was not below the level of reasonably competent assistance to which an accused is constitutionally entitled. However, even accepting the alleged deficiencies, we conclude the record fails to establish that, but for trial counsel's defi-ciencies, the result of the trial would have been different.

*Id.* at 16 (citing *Strickland* ).

Houchin's first argues in his petition, because the court of appeals found the overall performance of defense counsel was "below the level of reasonably competent assistance to which an accused is constitutionally entitled," *id.,* the presumption of prejudice required by *Cronic* applied and he was not required to prove actual prejudice to the outcome of his case. He asserts for this reason, the court of appeals should have reversed his convictions.

Both the state district court, in its ruling following the Rule 35 hearings, and the court of appeals addressed themselves to specific acts and omissions of counsel during the trial. The court of appeals found, based on such acts and omissions, counsel's performance was constitutionally deficient. Citing *Strickland,* it nevertheless determined, Houchin had not demonstrated a reasonable probability that but for the deficient performance the outcome would have been different.

Houchin effectively suggests I take the appeals court's conclusion under one prong of the *Strickland* test and import it into the *Cronic* standard in order to bypass proof of prejudice. Such legal reasoning requires one, based on a finding of deficient performance of counsel under the first prong of *Strickland,* to abandon an inquiry concerning the second prong of prejudice and to determine the case falls into the narrow circumstances of *Cronic* where prejudice is presumed.

The circumstances of this case are not in harmony with those in cases cited by Houchin in support of his contention that *Cronic* applies. Further, Tenth Circuit authority does not support such analogy.

Houchin cites *United States v. Swanson,* 943 F.2d 1070, 1075 (9th Cir.1991) where the court-appointed defense counsel conceded during closing argument that no reasonable doubt existed regarding the only factual issues in dispute. The appeals court held counsel's abandonment of his client's defense

---

**2.** The court of appeals did not address Heaton's apparent intoxication at trial.

caused a breakdown in the adversarial system of justice, was inherently prejudicial and, under *Cronic*, no separate showing of prejudice was necessary. *Id.* at 1074–76.

Here, however, unlike in *Swanson*, there is nothing to suggest Houchin's counsel conveyed to the jury the belief that his client was guilty or that he abandoned his duty of loyalty to Houchin and joined the state in an effort to sustain a conviction.

Houchin also relies on *Harding v. Davis*, 878 F.2d 1341, 1345 (11th Cir.1989). There, the court of appeals held the defense attorney "abrogated his duty of representation by failing to object when the trial court directed a verdict against his criminal defendant client." *Id.* This silence of counsel at the point the verdict was directed against his client amounted to a denial of counsel, i.e., it was so likely to prejudice the defendant that, under *Cronic*, the cost of litigating its effect was unjustified and prejudice was presumed. *Id.* Nothing here, however, suggests Houchin's counsel was silent at a critical stage of trial so that Houchin was effectively denied counsel.

Houchin also cites *Javor v. United States*, 724 F.2d 831, 834–35 (9th Cir.1984). There, the court found prejudice inherent where counsel slept through parts of the trial. *Id.* The *Javor* court distinguished the facts before it from those in *Cooper v. Fitzharris*, 586 F.2d 1325, 1331 (9th Cir.1978), *cert. denied*, 440 U.S. 974, 99 S.Ct. 1542, 59 L.Ed.2d 793 (1979). It noted in *Cooper* the claim of ineffective assistance of counsel was based on "'*specific acts* and *omissions* of defense counsel at trial,'" *Javor*, 724 F.2d at 834 (quoting *Cooper*, 586 F.2d at 1327). In *Javor*, however, the court found prejudice was inherent because defense counsel had slept during a substantial portion of the trial and the defendant had no legal assistance during that period. *Javor*, 724 F.2d at 834.[3]

Turning to Tenth Circuit authority, in *Osborn v. Shillinger*, 861 F.2d 612, 629 (10th Cir.1988), the court determined the defense attorney had turned against his client and effectively joined the state in the effort to obtain a death sentence. Applying the reasoning in *Cronic*, the court found the process by which the defendant had pled and was sentenced to death was not adversarial and therefore not reliable. Further, the court found the attorney suffered from a conflict between his client's interests and his own sympathy with the prosecution's position. The *Osborn* court went on to find that "[p]rejudice, whether necessary or not, is established under any applicable standard." *Id.* In the case before me, there is no indication that Houchin's counsel suffered a conflict of interest, nor that the process by which Houchin pled or was sentenced was not adversarial.

In *United States v. Hall*, 843 F.2d 408, 411–13 (10th Cir.1988), the defendant argued the fact that his counsel entered his appearance only three weeks before trial gave rise to a presumption of ineffectiveness without inquiry into counsel's actual performance at trial. The court held the time frame of the case did not give rise to a presumption of ineffectiveness, nor did the fact that defense counsel had not previously tried a complex continuing criminal enterprise case of this nature. Accordingly, the court examined the actual performance of counsel under the *Strickland* standard. *Id.* at 413.

Similarly, in *United States v. Espinosa*, 771 F.2d 1382, 1411 (10th Cir.1985), counsel from the public defender's office had been appointed to represent the defendant and had spent considerable time for approximately two months on the preparation of the case. The court found, in the circumstances of the case, four days was sufficient for substitute counsel from the public defender's office to prepare adequately for trial. The Tenth Circuit concluded a presumption of ineffectiveness under *Cronic* was not justified and it was required to examine counsel's actual performance at trial under *Strickland*. *Id.*

In this petition, Houchin maintains the court of appeals' determination that counsel's overall performance was constitutionally deficient, mandates a presumption under *Cronic*

---

**3.** The *Javor* court, ruling in January, 1984 did not have the guidance of the Supreme Court in *Strickland* and *Cronic*, both decided on May 14, 1984. However, the reasoning in *Javor*, was analogous to that in *Cronic*, and that in *Cooper*, to the rationale in *Strickland*.

that his conviction was insufficiently reliable to satisfy the constitution.

Although the appeals court found counsel's overall performance deficient, it did not find that counsel's errors robbed the proceedings of their adversarial nature giving rise to a presumption of prejudice. To the contrary, the court found Houchin had failed to establish the requisite prejudice and applied the *Strickland* standard.

The errors alleged by Houchin do not amount to a showing of an actual conflict of interest or the complete absence of counsel during a critical stage of the proceedings. As such, they did not rob the proceedings of their adversarial nature so as to result in a verdict which was constitutionally unacceptable.

Rather, this case, like *Strickland*, "concerns claims of ineffective assistance based on allegations of specific errors by counsel— claims which by their very nature, require courts to evaluate both the attorney's performance and the effect of that performance on the reliability and fairness of the proceeding." *Strickland*, 466 U.S. at 702, 104 S.Ct. at 2072. Thus, Houchin "must show not only that his lawyer's performance was inadequate but also that he was prejudiced thereby." *Id.*

Accordingly, I reject Houchin's contention that the presumption of prejudice required by *Cronic* applies. I therefore turn to an analysis under *Strickland*.

### B. *Strickland Analysis.*

*Strickland* sets the standard to analyze specific legal actions of counsel for their effectiveness and whether these actions prejudiced the outcome of the trial. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064.

There, the Supreme Court required the defendant show not only objectively unreasonable assistance of counsel, but that this unreasonable assistance prejudiced the outcome of the trial. *Strickland*, 466 U.S. at 687, 693, 104 S.Ct. at 2064, 2067–68. To demonstrate prejudice the defendant must show, but for counsel's deficient conduct, there is a reasonable probability the outcome would have been different. *Id.* at 694, 104

S.Ct. at 2068. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*

The *Strickland* standard includes a duty of reasonable investigation. *Id.* at 691, 104 S.Ct. at 2066–67. "[C]ounsel has a duty to make reasonable investigations or a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 691, 104 S.Ct. at 2066.

■ This duty encompasses an obligation to contact a potential witness unless counsel " 'can make a rational decision that investigation is unnecessary.' " *Montgomery v. Petersen,* 846 F.2d 407, 413 (7th Cir.1988) (quoting *Crisp v. Duckworth,* 743 F.2d 580, 583 (7th Cir.1984)). A defendant who challenges his counsel's effectiveness because counsel decided not to interview a potential witness, must establish the decision not to interview was unreasonable from counsel's perspective at the time the decision was made. *Chambers v. Armontrout,* 907 F.2d 825, 828 (8th Cir.), *cert. denied,* 498 U.S. 950, 111 S.Ct. 369, 112 L.Ed.2d 331 (1990).

Courts should, however, refrain from hindsight to second-guess counsel's tactical judgments. *Osborn,* 861 F.2d at 625 (citing *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065); In *Chambers,* counsel failed to secure the testimony of the only eyewitness that could corroborate defendant's self-defense theory. *Chambers,* 907 F.2d at 829. In *Montgomery,* counsel failed to investigate the only disinterested alibi witness. *Montgomery,* 846 F.2d at 413.

Generally, under *Strickland*, one must determine *de novo*, whether counsel's performance was deficient and whether, but for the deficient performance, the result of the proceeding would reasonably likely have been different. *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2067–69. However,

> [t]here is no reason for a court deciding an ineffectiveness assistance claim to approach the inquiry in the same order or even to address both components of the

inquiry, if the defendant makes an insufficient showing on one.... If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.

*Id.* at 697, 104 S.Ct. at 2069.

In this petition, Houchin asserts defense counsel essentially abandoned his only viable defense, that he lacked the requisite specific intent for first degree murder. He maintains his counsel failed to (1) investigate forensic evidence concerning his state of mind when he shot Mr. and Mrs. Naureth; (2) interview witnesses who could testify about Houchin's later conversations concerning his state of mind; (3) present a theory of defense to the jury; (4) submit instructions concerning a lack of *mens rea;* (5) appear at trial sober; (6) meet with Houchin sufficiently before trial. I address each of the alleged deficiencies under *Strickland.*

(1) *Failure to investigate forensic evidence concerning Houchin's state of mind when he shot Mr. and Mrs. Naureth.*

(a) *Houchin's state of mind when he shot Mrs. Naureth.*

■ Houchin asserts had he been able to present evidence that the bullet which entered Mrs. Naureth's body ricocheted from the top of the car, he would have confirmed his testimony that he did not intend to shoot her, thus nullifying the "after deliberation and with the intent to cause the death of a person other than himself" element of first degree murder.[4]

Testimony at the Rule 35(c) hearing reflected that, because of financial concerns, the case file was not forwarded to Richard Fox, a forensic expert, in sufficient time to allow him to prepare any investigation. There was also testimony that, because of the delay, attorney Perlet attempted to obtain information from the forensic expert by telephone on the day before trial to assist in

cross-examination of the prosecution's experts. Perlet disputed this version and claimed he made a tactical choice not to call a defense expert but to rely solely upon his cross-examination of the prosecution's experts.

Fox suggested some questions for Perlet to pose to the Central Bureau of Investigation ("CBI") experts, but did not believe he could assist Perlet further. Perlet did not have any of the evidence independently tested and relied upon the CBI. experts. He testified he knew what their results were and felt they would be more believable than experts hired by the defense.

At the Rule 35(c) hearing, an experienced criminal defense attorney, Craig Truman, testified that the forensic work necessary to prove up any defense theory in this case is extremely complicated. He testified that retention of independent forensic experts was crucial to the defense both with regard to proving a defense theory and cross-examining the prosecution's experts.

The trial court found the defense team adopted as defenses to the shooting of Mrs. Naureth, Houchin's intoxication, general lack of intent and an accident theory. To support this, the defense presented evidence at trial that Houchin had been drinking heavily before the shooting of Mrs. Naureth, that a half-empty bottle of vodka was found in the house, that it was dark outside and the light in the garage was on when Houchin shot at Mrs. Naureth, and that one bullet had struck a Lincoln vehicle in the path of Mrs. Naureth's flight from the scene. Houchin testified he was intoxicated and did not intend to shoot Mrs. Naureth. One witness testified Houchin was not drunk upon his arrest, another testified he was. The trial court determined the theory that the bullet that killed Mrs. Naureth had ricocheted off the Lincoln in the driveway was of less significance, that Houchin admitted the act, but denied having the culpable mental state.

The trial court further found the defense evidence at the Rule 35 hearing had not

---

**4.** Under the Colorado Criminal Code a person commits the crime of murder in the first degree if "[a]fter deliberation and with the intent to cause the death of a person other than himself, he causes the death of that person or of another person...." Colo.Rev.Stat. § 18–3–102(1)(a) (1986).

established that the failure of defense attorneys to have the bullet fragment recovered from the body of Mrs. Naureth examined or tested for evidence of ricochet was an omission which fell outside the range of reasonably competent assistance demanded of attorneys practicing criminal law.

Moreover, the trial court noted all attorneys who testified at the Rule 35 hearing agreed this was a very strong case for the prosecution. At best, regarding the shooting of Mrs. Naureth, the errors allegedly committed by counsel may have provided additional evidence of accident, which would have been merely cumulative. It noted nothing was presented in the Rule 35 hearing which would explain why Houchin fired two shots at Mrs. Naureth from a single-action revolver while she fled. The trial court concluded the evidence of Houchin's guilt was overwhelming.

The appeals court considered itself bound by the trial court's conclusion that Houchin had not shown prejudice from the failure to examine the bullet that struck Mrs. Naureth for evidence of ricochet. It found support in the record for this conclusion because Houchin presented no evidence at the Rule 35(c) hearing to support the ricochet theory.

Under *Strickland,* "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691, 104 S.Ct. at 2066. "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.*

At the Rule 35 hearing, Perlet testified there was not much dispute at trial over the fact that the bullet went across the top of the Lincoln. He referred to the trial testimony of Cordell Brown of the CBI to the effect that his findings were consistent with the bullet "actually striking the Lincoln and passing over its surface." (Trial Tr. Vol. 10 at 570.) Perlet stated he considered ricochet had been established.

Perlet had decided to rely on the CBI experts, rather than retain his own. The trial record reflects that the CBI expert's findings were consistent with a theory of ricochet. Assessing Perlet's decision for reasonableness in all the circumstances and applying a heavy measure of deference to his judgment in this regard, I find that the decision to rely on the CBI expert and the omission to have the bullet independently tested were not unreasonable. Accordingly, the first prong of *Strickland* is not satisfied.

Notably, evidence that the bullet that entered Mrs. Naureth's body ricocheted would not in and of itself establish that Houchin lacked the intent to kill, particularly in light of the fact two shots were fired. Moreover, nothing at the Rule 35 hearing established that Perlet's failure to pursue independently evidence concerning the bullet which killed Mrs. Naureth, was prejudicial to the outcome of the trial. Accordingly, the second prong of *Strickland* is not met.

(b) *Houchin's state of mind when he shot Mr. Naureth.*

(i) *Struggle.*

■ Houchin asserts had his counsel prepared Richard Fox as an expert witness to testify concerning forensic tests showing that Houchin's shirt collected dust from the floor of the garage, Houchin could have confirmed his testimony that he shot Mr. Naureth during a struggle and nullified the "after deliberation and with intent" element of first degree murder.

The trial court found it was the defense theory at trial that Mr. Naureth had been shot twice in the struggle with Houchin in the garage, that it was the second shot that caused Mr. Naureth's death, and that Perlet was aware that the CBI experts would corroborate some of this in their testimony. Perlet considered he had enough evidence, in addition to Houchin's testimony, to show Houchin had been involved in a struggle because dust on his shirt was like the dust from Mr. Naureth's sanding efforts found on the garage floor; that Houchin had been shot through the arm at near point-blank range in the struggle; that Houchin had a powder burn on his hand and that Mr. Naureth was

dead when he received the third gunshot wound to the head.

As noted by the trial court, post-conviction court orders of June 23 and July 8, 1988 authorized the release of Houchin's shirt, the overalls of Mr. Naureth and the lead bullet taken from the body of Mrs. Naureth. The orders were at the request of Houchin so that his forensic expert could examine and test the released items. Forensic expert Richard Fox looked at the evidence on July 13, 1988 but neither examined nor tested it. Before he testified at the Rule 35 hearing, Fox was also provided with the CBI reports and notes from the case.

Fox did not testify that there were any defects in the CBI test results. He commented that he could only speculate on several issues. He offered no forensic advice concerning the gunshot wound to the head of Mr. Naureth besides his belief that a forensic pathologist should have been consulted regarding the cause of death.

Dr. David L. Bowerman, a forensic pathologist testified at the Rule 35 hearing that Mr. Naureth was still alive at the time the gunshot wound to the head was inflicted and that that shot caused his death. He said he had previously told this to Perlet. Dr. Bowerman's testimony at the Rule 35 hearing was unwavering regarding the time and cause of Mr. Naureth's death. His opinion was based on the autopsy report and was reinforced by the fact that Mr. Naureth had scrawled words in the dust. This indicated he was alive after the initial shots because it was unlikely that he could scrawl such words after the massive gunshot wound to the head.

Perlet testified, even if a forensic expert had been fully engaged and could substantiate that there had been a struggle between Houchin and Mr. Naureth, and that Houchin had been shot, no defense was known for the gunshot wound to the head which Dr. Bowerman testified had caused the death.

In ruling on the Rule 35 hearing, the trial court found the trial testimony established there was dust all over the garage floor; that someone had been sanding and there were smeared footprints and scuff marks on the garage floor; that a bullet was found in the garage ceiling, that the damage was consistent with firing from Houchin's gun; that Houchin's shirt had powder burns, was torn and had dust on it; that Houchin had powder burns on his arm; that his wound was from a muzzle held quite close to his arm and nearly parallel; that Mr. Naureth had enough gunshot residue on his hands to indicate he may have fired the gun, held it when it had been fired, or been in close proximity when it was fired; and that Houchin was wounded in the struggle. Further, the trial record disclosed that the prosecution conceded there was a struggle between Houchin and Mr. Naureth.

The trial court concluded Houchin's evidence at the Rule 35 hearing did not establish, *inter alia*, that the failure of defense counsel to perform tests on the shirt worn by Houchin to determine how far the gun was away from him at the time he was shot and whether the dust on Houchin's shirt was the same as that found on the garage floor, were acts or omissions falling outside the range of reasonably competent attorney assistance.

It was determined by the trial court that at most, the errors allegedly committed by counsel may have provided additional evidence of struggle and/or self-defense and/or accident. Finally, it said, nothing was presented at the Rule 35 hearing which would account for the wound to the head of Mr. Naureth, which, the trial court stated, caused his death. *Houchin I* at 30. It concluded the evidence of Houchin's guilt was overwhelming on both counts.

Thus, the trial court found neither prong of the *Strickland* test had been met regarding the failure of defense counsel to evaluate and investigate the existence of a struggle. The appeals court concluded this finding was supported by the record because evidence was presented, and the prosecution conceded at trial, the existence of struggle between Houchin and Mr. Naureth. The appeals court also pointed to the expert testimony at the Rule 35 hearing showing that the final gunshot wound to the head was the fatal shot to Mr. Naureth, notwithstanding the previous struggle.

In this habeas proceeding, Houchin maintains it was ineffective assistance of counsel not to retain Richard Fox as an expert wit-

ness to testify concerning forensic tests showing that Houchin's shirt collected dust from the floor of the garage, because this would have confirmed Houchin's testimony that he shot Mr. Naureth during a struggle, thus nullifying the requisite intent for first degree murder. I disagree.

First, counsel's failure to retain Fox to testify in this regard cannot be said to have been unreasonable since, counsel was able to establish, without his testimony that a struggle occurred. This was admitted by the prosecution at the close of the case. Fox's evidence would have been merely cumulative in establishing a struggle.

Further, Fox's testimony at the Rule 35 hearing did not reflect any defect in the results of the forensic tests of the CBI experts on which Perlet relied. Fox could merely speculate in this regard and could not provide an explanation for the third shot to Mr. Naureth's head, which forensic expert, Dr. Bowerman, testified at the hearing, was the fatal shot.

Thus, Houchin fails to establish that there is a reasonable possibility that, but for the failure to retain Fox to testify concerning the struggle, the result of the proceeding would have been different. Neither prong of *Strickland* is met.

(ii) *Blood Alcohol Level.*

■ Houchin next asserts had his counsel presented evidence from an expert toxicologist about his blood alcohol level at the time of the shootings, he would have negated the "after deliberation and with intent" element.

At the Rule 35 hearing, Perlet testified that he did not seek out the toxicological expertise of Dr. Bowerman because Dr. Bowerman had stated extrapolation to the time of the shootings would be speculative. Further, Dr. Bowerman would have testified that the final shot to Mr. Naureth caused his death.

Houchin, asserts Perlet could have called expert witness Dr. Kier whom the investigator Robert Brown had located and who said he could extrapolate to the time of the killing from the blood alcohol level taken several hours later. However, at the Rule 35 hearing, Truman testified that, during a hearing on a motion to introduce Houchin's blood alcohol level after his arrest, Dr. Kier had difficulty extrapolating back that far. As a result of this difficulty, the court ruled the blood alcohol level at the time of arrest could not come into evidence for the purposes of mitigation or for use in the defense of diminished capacity.

Later in the trial, Perlet indicated he wanted to introduce Dr. Kier's testimony to impeach the credibility of Ronald Miller, a physician's assistant who treated Houchin at the hospital, that he did not see any evidence of intoxication or smell alcohol on Houchin. Although the court ruled Perlet could do so, Perlet did not follow up and did not call Dr. Kier.

Houchin argues the only evidence of his intoxication was his own testimony, Linda Naureth's testimony that his eyes seemed bloodshot and, in the past, this sometimes indicated he was drunk, and a vodka bottle found in the garage. He maintains failure to present expert testimony in this regard was fatal to his defense that he lacked the necessary deliberation.

Perlet testified at the Rule 35 hearing that he was aware of Dr. Kier's opinion that he could have extrapolated backwards to an extent but said Dr. Bowerman considered this testimony weak. Perlet did not consider expert testimony concerning Houchin's blood alcohol level at the time of arrest would have been very relevant or material to whether he was intoxicated at the time of the shooting. Perlet considered he could establish Houchin's drunkenness through the testimony of Linda Naureth and another witness at the hospital who said Houchin was drunk.

Dr. Bowerman testified at the Rule 35 hearing that he did not consider it scientific to extrapolate back to determine the blood alcohol level of an individual at a particular time based upon a blood sample taken at a later time. He stated he would not extrapolate.

The trial court found that the defense attorneys had adopted the defenses of intoxication and lack of deliberation and intent as to the shooting of Mrs. Naureth. At trial, evidence was introduced that Houchin had

been drinking heavily before he shot her, that a half-empty bottle of vodka was found in the house, and Houchin testified he was intoxicated and had not intended to shoot Mrs. Naureth. The trial court determined evidence of Houchin's blood and urine alcohol levels obtained at the hospital twelve or more hours after the shooting provided little support to the defense of intoxication at the time the shootings occurred.

The trial court noted that nothing was presented at the Rule 35 hearing which would explain why Houchin fired two shots from a single-action revolver at the fleeing Mrs. Naureth. It determined the evidence of Houchin's guilt was overwhelming.

The court of appeals noted there was no evidence at the Rule 35 hearing to show the viability of extrapolation evidence or what the results of such extrapolation would have been, or what Houchin's blood level was at the time of the shootings. It concluded counsel's conduct in not retaining an expert toxicologist in this regard did not fall beneath the level of minimally acceptable performance. I agree.

The record establishes that Dr. Kier's evidence at the pretrial hearing showed some difficulty with attempting an extrapolation. Further, Dr. Bowerman, whose laboratory had performed the blood alcohol test on the sample taken following arrest, testified at the Rule 35 hearing that he had told Perlet he would not extrapolate because he considered it unscientific. He iterated this opinion in his testimony at the hearing.

Considering all the circumstances and applying a heavy measure of deference to Perlet's judgment in this regard, I do not find his failure to retain an expert toxicologist to testify about Houchin's blood alcohol level fell below an objective standard of reasonableness. Nor does the record reflect that the result of the trial would have been different had a toxicologist so testified.

(iii) *Impaired Mental Condition.*

■ Houchin asserts, had his counsel presented evidence that he suffered from an impaired mental condition, he would have negated the "after deliberation and with intent" element.

The deputy public defenders who initially represented Houchin had him evaluated by a psychiatrist, Dr. Dean Plazak, who found that he had several symptoms or indications of a mental disorder known as "borderline syndrome." Dr. Plazak reported orally to deputy public defender Steve Alcala that he thought there was potential for the defense of impaired mental condition. Alcala made some notes of his conversations with Plazak and included them in the materials supplied by the deputy public defender to Heaton and Perlet.

Heaton and Perlet also received from Alcala a prior report by a Dr. Tinker, addressing an alleged incestuous relationship between Houchin and his daughter, and including other psychiatric and psychological reports. Heaton and Alcala talked extensively about Plazak's findings although neither Heaton nor Perlet talked with Plazak.

Heaton did confer with Dr. Pelc, a psychologist who evaluated Houchin. Heaton and Perlet talked extensively about the impaired mental condition defense and its factual background. As a result, a neurological evaluation of Houchin was conducted by Dr. Bruce Peters. This included an E.E.G. scan and a test involving the study of Houchin's brain after the consumption of alcohol.

Perlet testified, after reviewing the facts, reports and law, a conscious decision was made to reject the defense of impaired mental condition. The defense team withdrew the motion to permit such evidence. Both Heaton and Perlet were present when the motion was withdrawn.

Perlet did not want to subject Houchin to the psychological interviews required by the state, nor did he want to disclose to the prosecution the information contained in the reports. He considered disclosure to the jury of the incestuous relationship between Houchin and his daughter would be prejudicial to Houchin. Perlet had attended a trial lawyers' convention regarding impaired mental condition in 1985 and regarded the defense as weak and dangerous. Applying his professional judgment, he decided intoxi-

cation and lack of intent, coupled with Houchin's trauma, would have a better chance of success.

In place of the defense of impaired mental condition, the defense adopted the defense of intoxication, general lack of intent and accident to avoid the adverse effects of the statute while still presenting evidence of lack of specific intent.

Perlet pointed out at the Rule 35 hearing that juries have a difficult time accepting the mental impairment defense. Dr. Plazak too testified that the diagnosis of impaired mental condition would have been extremely difficult to present to a jury.

Attorney Craig Truman testified that it was below the minimum standard of effective representation for Perlet to withdraw the defense of diminished mental condition without talking to Dr. Plazak. He too, however, acknowledged that a diminished mental capacity defense would have been a difficult concept to bring in front of the jury.

Dr. Seymour Sundell, a psychiatrist who reviewed transcripts of Houchin's trial testimony and Dr. Plazak's testimony at the Rule 35 hearing and certain medical records, disagreed with Dr. Plazak that Houchin had a major psychotic disorder.

The trial court concluded the evidence failed to support a finding that withdrawing the impaired mental condition defense fell outside the range of reasonably competent assistance demanded of attorneys practicing criminal law. The appeals court apparently adopted the trial court's finding that the decision not to advance the defense of impaired mental condition was a strategic one made after sufficient investigation of viability. I agree with this conclusion.

Taking account of all relevant circumstances and applying a heavy measure of deference to defense counsel's judgment, I find the evidence at the Rule 35 hearing did not show that the defense decision not to pursue the impaired mental condition defense fell below an objective standard of reasonableness. Accordingly, the first prong of *Strickland* is not met and I do not reach the second.

(2) *Failure to interview witnesses who could testify about Houchin's later conversations concerning his state of mind.*

█ Houchin next points to Perlet's failure to interview or contact an inmate, located by Heaton, who could have rebutted the testimony of two inmates that Houchin told them he had killed Mr. and Mrs. Naureth deliberately and maliciously.

The prosecution endorsed two jail witnesses, John Arthur Martin and J.P. Ripley, who had gained information from Houchin while incarcerated with him. An attempt was made to interview Ripley but he denied he had talked to Houchin.

Defense investigator Brown investigated Martin and found a federal prisoner and convicted felon, Michael Hyde, who could discredit Martin's information. Brown conducted a taped telephonic interview with Hyde and submitted the transcript to Perlet and Heaton.

Brown thought Hyde should be personally interviewed at the federal institution in El Reno, Oklahoma and advised Heaton accordingly. Brown testified Heaton asked Perlet for permission for Brown to go to Oklahoma but Perlet did not authorize the financial expenditure.

Perlet testified he discussed the witness Hyde with Heaton and Brown and made a strategic decision not to call him. He felt there were inconsistencies between the statements of Martin, Riplie and Linda Naureth but that there was more consistency between those of Riplie and Linda Naureth. He considered that bringing in another "jail house snitch" whose testimony would impeach Martin, would effectively lend credibility to that of Linda Naureth and Ripley. Perlet testified he chose rather to use other means to impeach Martin, such as his own record, and also chose to use Martin's testimony to discredit Linda Naureth's and Riplie's.

The trial court noted Hyde was not called as a witness at the Rule 35 hearing to confirm or deny he would have given testimony to discredit that of Martin. Defense witness Virgilio testified he attempted to arrange for Hyde to be brought to the Rule 35 hearing

but it would have cost between about $3,500 and $5000 to do so. The trial court determined the evidence at the Rule 35 hearings did not establish that defense counsel's failure to follow up on witness Hyde to impeach the testimony of prosecution witness Martin was an omission falling below the range of reasonably competent assistance demanded of attorneys practicing criminal law.

The appeals court agreed with the trial court's determination that Perlet's decision not to use Hyde was a strategic one and that the failure to further investigate Hyde was not outside the range of reasonably competent performance.

Houchin argues in this habeas proceeding that the failure to interview Hyde who could have impeached Martin's testimony on the crucial issue of Houchin's state of mind when he killed the Naureths was prejudicial. Houchin disputes Perlet's testimony that impeaching Martin would have lent credibility to Ripley and Linda Naureth because there were no significant inconsistencies between the credibility of Riplie and Martin.

Again, however, taking all relevant circumstances into account and applying a heavy measure of deference to defense counsel's judgment, I find the evidence at the Rule 35 hearing did not show the decision not to interview Hyde fell below an objective standard of reasonableness.

(3) *Failure to present a theory of defense to the jury or to submit instructions concerning a lack of mens rea.*

Houchin argues counsel's failure to tell the jury about his theory of defense in opening statement or to provide the jury with a theory of the case instruction amounted to failure to tell the jury that there were defenses to first degree murder.

The trial court found defense counsel adopted the theory of self-defense as to Mr. Naureth, and those of intoxication and lack of deliberation as to Mrs. Naureth. It determined that, although some evidence in support of these theories was presented at trial, defense counsel's failure to articulate any theory in his opening statement and failure to tender to the trial court for presentation to the jury any instruction on a theory of defense, was below the range of minimal competence.

The court of appeals agreed that counsel's performance was deficient in this regard, but concluded the outcome would not have been different had counsel performed competently.

I, too, consider that in failing to articulate a theory of defense in opening statement and failing to provide the jury with a theory of the case instruction, counsel's conduct fell below an objective standard of reasonableness. However, addressing the second part of the *Strickland* test, I do not find there is a reasonable probability, that, but for these unprofessional errors, the result of the trial would have differed.

(4) *Heaton's conduct during trial.*

A further issue raised by Houchin is Heaton's conduct at trial. The trial court found testimony showed Heaton had been drinking during trial and may have been under the influence of alcohol when he cross-examined a witness. As a result of this cross-examination, the record reflected a number of objections made by the prosecution were sustained and that the court admonished Heaton *sua sponte.*

The trial court found Heaton's conduct in the courtroom and cross-examination of Ron Miller, the physician's assistant who treated Houchin, were outside the range of reasonably competent assistance demanded of attorneys practicing criminal law and had a negative effect on Houchin's defense. The appellate court did not address Heaton's intoxication at trial.

Perlet testified that he considered Heaton's cross-examination of Miller to be detrimental to Houchin, although he did not consider Miller, who only saw Houchin hours after the killings, to be an important witness. Thereafter, Perlet decided not to allow Heaton to examine any future witnesses.

I conclude Heaton's conduct at trial fell below an objective standard of reasonableness. However, there is no evidence to show that, but for this unprofessional conduct, the result of the trial would have been different.

Accordingly, the prejudice prong of *Strickland* is not met.

(5) *Failure to meet with Houchin sufficiently before trial.*

Houchin complains Perlet's failure to meet with him sufficiently before trial fell below an objective standard of reasonableness.

The record shows Heaton and Brown visited Houchin fairly regularly, but Perlet only discussed the case with Houchin at the courthouse before or after various court proceedings. The record is unclear as to the extent Perlet received or was willing to receive information which Houchin had imparted to Heaton and Brown.

Attorney Craig Truman, testifying at the Rule 35 hearings, opined that it would have been necessary, at minimum, for Perlet to have visited Houchin within a week of receiving the case and as necessary thereafter to gain some understanding of his mental status and to establish a rapport. He felt Houchin's perceptions concerning the crime were crucial to establishing a theory of defense.

The trial court found the failure of Perlet to have spent more time with Houchin to prepare him to give testimony at trial was outside the range of competent attorney assistance. However, it apparently found the second prong of the *Strickland* test was not met. The appellate court agreed there had been no showing of prejudice to meet Houchin's burden at the Rule 35 hearing.

I, too, find Perlet's failure to visit Houchin before and during the course of the trial fell below an objective standard of reasonableness. Again, however, the evidence does not show a reasonable probability that the result of the trial would have differed had Perlet been more conscientious in terms of his visits to Houchin.

### VII. *Conclusion.*

I find the representation afforded to Houchin fell below an objective standard of reasonableness in certain specific respects, namely Perlet's failure to present a theory of defense to the jury, to submit a jury instruction concerning *mens rea,* and to visit Houchin during the course of the trial and Heaton's lack of sobriety and cross-examination of witness Ron Miller at trial.

I find, however, the nature of the representation was not such, that it falls within the narrow class of circumstances contemplated in *Cronic,* 466 U.S. at 658–62, 104 S.Ct. at 2046–48, where prejudice is presumed.

Further, I find that, even if cumulatively, the errors in professional conduct were to render the overall performance of counsel below the level of reasonable assistance, there has been no demonstration of a reasonable probability that, but for these errors, Houchin's convictions would have differed. Accordingly, the requisite showing of prejudice has not been made. *Strickland* 466 U.S. at 686, 104 S.Ct. at 2063.

Houchin has not established that he was deprived of his right to effective assistance of counsel at trial. Accordingly,

IT IS ORDERED THAT the Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 is DENIED.